Stanley **MOORE**, Petitioner,

v.

Charles **SCULLY**, Respondent.

No. 89 Civ. 0546 (DNE).

United States District Court, S.D. New York.

Feb. 27, 1997.

---

Stanley Moore, Pine City, NY, pro se.

*OPINION & ORDER*

EDELSTEIN, District Judge:

Presently before this Court is the habeas corpus petition of Stanley Moore ("petitioner" or "Moore"), pursuant to Title 28, United States Code, Section 2254, seeking to vacate a judgment of conviction imposed on him by the Supreme Court of the State of New York, Bronx County, on February 24, 1983, for burglary in the first degree (New York Penal Law § 140.30[3]) and two counts of robbery in the first degree (New York Penal Law § 160.15[3]). Petitioner's conviction arose out of an incident that occurred on May 25, 1982. Petitioner was charged with driving a getaway car after his two co-defendants had burglarized a dwelling and robbed its occupants. The Appellate Division, First Department, affirmed petitioner's conviction without opinion, *People v. Moore*, 133 A.D.2d 551, 519 N.Y.S.2d 159 (N.Y.App.Div.1987), and the New York Court of Appeals denied petitioner's leave to appeal. *People v. Moore*, 70 N.Y.2d 1009, 526 N.Y.S.2d 944, 521 N.E.2d 1087 (N.Y.1988).

On January 24, 1989, petitioner filed the instant habeas corpus petition. On September, 1, 1989, Moore requested that his petition be held in abeyance so that he could challenge the constitutionality of his sentence in the New York State courts. On January 18, 1990, this Court adopted a recommendation of United States Magistrate Judge Nina Gershon ("Magistrate Judge Gershon"), and placed this case on the suspense docket.

Petitioner then moved in the Supreme Court, Bronx County, to vacate the judgment and set aside his sentence, pursuant to New York Criminal Procedure Law sections 440.10 and 440.20. (Report and Recommendation of United States Magistrate Judge Nina Gershon, *Moore v. Scully*, 89 Civ. 0546 ("May 1994 Report") at 2 (May 4, 1994).) Petitioner's motion was denied on April 4, 1990. *Id.* On April 23, 1990, petitioner sought leave to appeal the denial of his motion to the Appellate Division, First Department, pursuant to New York Crimi-

nal Procedure Law section 460.15. *Id.* It is undisputed that petitioner's application was denied. *Id.* at 2 & n. 1.

On February 11, 1991, petitioner moved for a writ of error coram nobis in the Appellate Division, First Department, and on February 21 and May 6, 1991, filed "addendums" to his application. *Id.* at 2. The Appellate Division, First Department, denied petitioner's application for a writ of error coram nobis on May 30, 1991. *Id.* Petitioner filed a second petition for a writ of error coram nobis in the Appellate Division, First Department, on March 5, 1992. The court denied this second application on June 25, 1992. *Id.*

On May 8, 1992, petitioner moved in the Supreme Court of the State of New York, Bronx County, for disclosure of his presentence report, pursuant to section 390.50 and 390.60 of the New York Criminal Procedure Law. *Id.* at 2–3. Petitioner argued that he was sentenced on the basis of misinformation in the presentence report, and that his presentence report was confused with his brother's. *Id.* at 3. The motion for disclosure was granted on June 24, 1992. *Id.*

On November 12, 1992, petitioner reactivated the instant case by filing an amended petition. In this petition, Moore seeks this Court's review of his state conviction on five grounds: (1) the element of intent, necessary to prove guilt, cannot be inferred and was not established beyond a reasonable doubt; (2) the trial judge made several prejudicial errors in his charge to the jury; (3) there was prosecutorial misconduct at trial and on summation; (4) petitioner was denied effective assistance of both trial and appellate counsel; and (5) the maximum sentence imposed violated due process. *Id.*

On May 4, 1994, Magistrate Judge Gershon recommended that Moore's petition be dismissed without prejudice "for petitioner's failure to exhaust state remedies as to all of his claims," under *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). (May 1994 Report at 11–12.) Petitioner objected to Magistrate Judge Gershon's recommendation on grounds that "[e]ach of the alleged unexhausted claims referred to by Magistrate Gershon, under the circumstances, were adequately put before the state's highest court upon which relief could obtain," and that this Court thus should find "that the petitioner did exhaust his state remedies and rule thereon." (Objection to Magistrate Report and Recommendation, *Moore v. Scully*, 89 Civ. 0546, at 1–3 (May 13, 1994).)

In an order dated June 21, 1994, this Court referred Moore's petition back to Magistrate Judge Gershon for consideration of petitioner's claim on the merits. (Order, *Moore v. Scully*, 89 Civ. 0546 (June 21, 1994).) On November 22, 1995, Magistrate Judge Gershon issued a second Report and Recommendation regarding petitioner's claims. (Report and Recommendation of United States Magistrate Judge Nina Gershon, *Moore v. Scully*, 89 Civ. 0546 ("November 1995 Report") (Nov. 22 1995).) In the November 1995 Report, Magistrate Judge Gershon addressed the merits of each of petitioner's claims. Based on the relevant legal standards, Magistrate Judge Gershon rejected each of petitioner's claims, and found that his petition for a writ of habeas corpus should be denied. *Id.* at 24. On December 8, 1995, petitioner filed objections to the November 1995 Report. (Objection to Magistrate Report and Recommendation, *Moore v. Scully*, 89 Civ. 0546 (Dec. 4, 1995).)

## DISCUSSION

Magistrate judges are empowered by statute to preside over pretrial matters on appointment by a district judge. 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72. Where, as here, a Magistrate Judge is "assigned without consent of the parties to hear a pretrial matter dispositive of a claim or defense of a party or a prisoner petition challenging the conditions of confinement ... [t]he magistrate judge shall enter into the record a recommendation for disposition of the matter, including proposed findings of fact where appropriate." Fed.R.Civ.P. 72(b).

Under Federal Rule of Civil Procedure ("Rule") 72(b), and Title 28, United States Code, Section 636(b)(1)(A), a district court evaluating a magistrate judge's recommendation is permitted to adopt those portions of the recommendation to which no specific ob-

jection is made, as long as those sections are not clearly erroneous. *Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 471–72, 88 L.Ed.2d 435 (1985); *see also Ehinger v. Miller,* 942 F.Supp. 925, 927 (S.D.N.Y.1996); *Washington v. Lenihan,* 87 Civ. 4770, 1996 WL 345950 (S.D.N.Y. June 21, 1996). Where a party makes a "specific written objection" within "[ten] days after being served with a copy of the [magistrate judge's] recommended disposition," Fed.R.Civ.P. 72(b), however, the district court is required to make a *de novo* determination regarding those parts of the report. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412–13, 65 L.Ed.2d 424 (1980).

The term *"de novo* determination" has "an accepted meaning in the law. It means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy." *Id.* at 690, 100 S.Ct. at 2419, 65 L.Ed.2d 424 (Stewart, J., dissenting); *see also Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (11th Cir.1988). Therefore, *de novo* review "means reconsideration afresh by the district judge in this sense: no presumption of validity applies to the magistrate's findings or recommendations." 7 Pt. 2 James Wm. Moore, Moore's Federal Practice, ¶ 72.04[10.–2], at 72–96 (1995). If the district court disagrees with the magistrate judge's proposals, or any part of them, the judge is free to substitute his own view for that of the magistrate judge without any threshold finding whatsoever. *Id.* However, while the district court is not required to conduct a new hearing regarding a party's objections to the magistrate judge's recommendations, it is required to review the record of the proceedings before the magistrate judge *Id.* at ¶ 72.04[10.–2], at 72–98.

In addition, "the district judge retains the power to engage in *sua sponte* review of any portion of the magistrate's report and recommendation, regardless of the absence of objections." 7 Pt. 2 Moore's Federal Practice, ¶ 72.04[10.–1], at 72–95. Such *sua sponte* review "may be under a *de novo* standard, or any lesser standard of review." *Id.* In making its review, "[t]he district judge may accept, reject or modify the recom-mended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b).

Because plaintiff timely filed objections to the Report, this Court is required to undertake a *de novo* review of the motions underlying Magistrate Judge Gershon's Report. Fed.R.Civ.P. 72(b). This Court first will review the facts underlying Magistrate Judge Gershon's November 1995 Report before reviewing the findings and recommendations contained in her November 1995 Report.

## I. Facts Underlying the November 1995 Report

Petitioner and his brother Terry Moore ("Moore") were tried jointly for the May 25, 1982, robbery of Joseph Bellantone and his sister Grace Bellantone in Joseph Bellantone's apartment, located in a three-family house. (November 1995 Report at 2.) Joseph Bellantone and his sister Rose Manzella, who lived downstairs but was present during the robbery, identified Terry Moore as one of two men who entered the Bellantone home and committed the robbery. *Id.* Roberto Gonzalez and Peggy Lee, neighbors of the Bellantones, testified that they saw defendant Stanley Moore driving the "getaway" car for the two robbers. Linda Ray, an employee of Williams Garage, testified that Stanley Moore leased a cab from the Garage which fit the description of the car seen by Gonzalez and Lee. *Id.*

Joseph Bellantone testified that at approximately 11:00 a.m. on May 25, 1982, he went to the front door of his apartment to put the mail out for the mailman and encountered two men in the doorway. *Id.* They asked Bellantone whether "Anthony" was there, and Bellantone responded that no one named Anthony lived there. The two men then pushed their way into the apartment as Bellantone was shutting the door. *Id.* at 2–3. Bellantone referred to the two men as the "taller" one, at a height of approximately six feet, one inch, and the "shorter" one, at a height of five feet, eleven inches, and identified Terry Moore as the taller of the two. *Id.* at 3. He testified that Terry Moore punched him and threw him on the floor. *Id.* The two men then proceeded into the bed-

room of his sister, Grace, who was bedridden, and began putting jewelry and trinkets in a pillowcase and demanding money from Grace. *Id.*

Joseph Bellantone testified that his sister Rose Manzella then came into the apartment. *Id.* The shorter of the two men grabbed her by the throat and put her on the bed in Grace's room. *Id.* Terry Moore found $2,000 in one of Grace's drawers and put it in his stocking. *Id.* At that time, Grace tipped over the phone, and the shorter man handed Terry Moore a knife to cut the phone cord. *Id.* Terry Moore then placed the knife to Grace's neck and said "[t]hat's how I could cut your throat too." *Id.* Later, he picked up the mattress on which Grace was lying, throwing her against the wall. *Id.* Finding no money, he grabbed Joseph Bellantone and demanded to know where more money could be found. The shorter man then came into the room and said "come on . . . let's go." *Id.*

Joseph Bellantone testified that the entire incident lasted approximately thirty minutes. *Id.* When the two men left the apartment, they took Joseph Bellantone to the vestibule. *Id.* After they existed, one of them tried to reenter the house but Joseph Bellantone locked the door. *Id.* at 3–4. Joseph Bellantone then went to the window and saw a car speed away. *Id.* at 4.

Rose Manzella identified Terry Moore, in a lineup and at trial, as one of the two men who had robbed the home of her brother and sister. *Id.* She testified that, after she entered the apartment, the men told her "we have weapons" and that she saw both men with knives. *Id.* The "short fella" handed the "tall fella" a knife, and the "tall fella" cut the phone cord. *Id.* She testified that the incident lasted approximately twenty minutes.

Roberto Gonzalez ("Gonzalez"), a stockbroker and lieutenant in the Army Reserves who lived across the street from the Bellantones, testified that he was walking his dog on May 25, 1982 at approximately 11:20 a.m. *Id.* He noticed a man in front of the Bellantones' house looking at a piece of paper. *Id.* Gonzalez saw the man, whom he described as six feet three inches tall, weighing 165–175 pounds, wearing a maroon windbreaker, cap,

dungarees and sneakers, enter the Bellantone house. *Id.* He then noticed a "bluish greenish" Plymouth Fury idling on Duncan Avenue. *Id.* His attention was drawn to the car because there are no stop signs on Duncan where the car was stopped. He testified that he looked at the driver, "eye to eye," from approximately fifteen feet away for eight to ten seconds. *Id.* He made an in court identification of Stanley Moore as the driver of the car. *Id.*

Gonzalez testified that he then began to look for his dog and heard the car "screech out from behind and start up towards Paulding, towards 3235 [the Bellantone house]," where it stopped. *Id.* at 4–5. He then saw two men running out of the Bellantone residence. One of them stopped and tried to reenter the house. *Id.* at 5. The two men then ran to the car. *Id.* Gonzalez concentrated on the license plate number of the car, which he later gave to the police. *Id.* He testified that the entire event, beginning with his observation of a man entering the Bellantone house, lasted approximately seven minutes. *Id.*

Peggy Lee, who lived next door to the Bellantones, testified that she was taking out her garbage at approximately 11:20 or 11:30 a.m. when she noticed a "bluish green" car with the passenger side door open. *Id.* She continued on her way to take the garbage out and then saw the car in front of the Bellantone house and saw "a guy get out of the car, stand up and he was saying, 'Come on. Come on. Come on. Let's go. Let's go. Let's go.'" *Id.* The man was facing the Bellantone house. *Id.* She identified Stanley Moore, in court, as the man she saw in the car. *Id.* She then saw "two black men—young boys—running out of Joe's house down the steps and they was laughing [sic]. They got in the car and it pulled off." *Id.* On cross-examination, defense counsel elicited that Lee had testified at the Grand Jury that she saw two people go into the Bellantone house and then saw them come out three to five minutes later. *Id.*

Linda Ray, the assistant manager of the Williams Garage, testified that she kept the records of the cabs that were leased by the

garage to the drivers. *Id.* She testified that Stanley Moore began leasing cars from the company in April of 1982. *Id.* He leased a bluish-green 1975 Fury with the license plate number L–47690 on May 25, 1982. *Id.* at 5–6. The car was returned to the garage on May 31, 1982 by someone other than Stanley Moore. *Id.* at 6.

Police Officer Ronald Mafaraci testified that he tested the Bellantone house for fingerprints following the robbery and found one latent print on the television set. *Id.* Police Officer Joseph Bergen testified that he compared the print recovered by Officer Mafaraci to the prints of Joseph Bellantone, Armando Morales and Terry Moore and that none of these prints matched the one recovered. *Id.*

Defendant Stanley Moore testified on his own behalf. *Id.* He testified that he was a cab driver, that he drove the Plymouth Fury until May 30, or May 31, 1982 and that he stopped driving it when it broke down on the Triboro bridge. *Id.* He called his boss, and they went together the next day to retrieve it. *Id.* He had driven the car on May 25, 1982, but he did not recall whether he drove it at night or during the day on that date. *Id.* He also testified that he checked the cab out for twenty-four hour periods and that, since he did not generally drive more than sixteen hours at a time, he sometimes allowed his friends Rob Ferguson and Frederick Hamilton to drive the cab during the twenty-four hour period. *Id.* He did not recall being in the vicinity of 3235 Paulding Avenue on May 25, 1982 and did not recall picking up his brother, Terry Moore, on that date. *Id.* He testified that he was twenty-six years old and had previously been convicted of two felonies when he was sixteen and seventeen years old. *Id.* at 6–7.

Frederick Hamilton testified that he had rented cabs from Stanley Moore, including the Plymouth Fury, on "quite a few" occasions. *Id.* at 7. Defendant Terry Moore did not testify, but was allowed to exhibit himself to the jury. *Id.*

On summation, petitioner's counsel argued that Stanley Moore's testimony that he did not recall being at 3235 Paulding on May 25, 1982, was honest. *Id.* He argued that, even if Stanley Moore had been on the street that day and had picked up two passengers, that would not indicate the he was involved in the robbery but would be consistent with his job of driving a cab. *Id.* He pointed out that, while Lee testified that she saw the passenger door of the car open and saw Moore standing outside the car yelling "come on" and "let's go," her testimony should be discounted because it conflicted with that of Gonzalez, who did not see the passenger door open and did not see Moore get out of the car and yell towards the Bellantone house. *Id.*

Counsel for Terry Moore argued that Moore, who was five feet eleven inches tall and weighed one hundred and fifty-five pounds did not fit the description given by the witnesses, and he argued that none of the witnesses noticed Moore's missing front tooth. *Id.* He also pointed out that Joseph Bellantone and Rose Manzella testified that the entire incident lasted twenty to thirty minutes and that there were many people on the street following the incident, while Gonzalez testified that the incident lasted approximately seven minutes and that there were no other people on the street. *Id.* at 7–8. Counsel also pointed out that Roe Manzella testified that there were two knives while Joseph Bellantone testified that there was only one. *Id.* at 8. He argued that their identification of Terry Moore was unreliable because of these discrepancies in their perception of the events, which may have been impaired by their age and the traumatic nature of the event. *Id.*

## II. Magistrate Judge Gershon's Findings

As previously stated, Magistrate Judge Gershon addressed and rejected the merits of each of petitioner's claims, and recommended that Moore's petition be denied. This Court will conduct a *de novo* review of each of petitioner's claims individually.

### A. Sufficiency of the Evidence

In his petition, Moore asserts that the prosecution failed to prove his guilt beyond a reasonable doubt. The law is settled that in a federal habeas corpus proceeding challenging the sufficiency of the evidence underlying

a state court conviction, the federal court must determine whether the evidence was sufficient to support a finding of guilt beyond a reasonable doubt, with explicit reference to the substantive elements of the criminal offense as defined by state law. *Jackson v. Virginia,* 443 U.S. 307, 324 n. 16, 99 S.Ct. 2781, 2792 n. 16, 61 L.Ed.2d 560 (1979). For a court making such a determination, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Woodby v. INS,* 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966)) (emphasis in original). Under this standard, "the trier of fact is left to fairly resolve conflicts or discrepancies in the testimony by weighing evidence and drawing inferences." *Id.*

Moore was convicted of burglary in the first degree and robbery in the first degree based on the theory of accomplice liability. The jury was charged, under New York Penal Law Section 20.00 that:

> When a person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

Petitioner argues that "[t]he evidence showed only that petitioner, an authorized taxi driver, picked up two passengers who exited a residence where it was later discovered that a burglary robbery was committed." (Petition at 5.) Moore claims that there was no evidence produced at trial to show his intent to commit robbery or burglary, and that the jury therefore could only speculate as to his involvement in the crime.

■ Under New York law, in order to be held liable as an accomplice, there must be "adequate proof of shared intent with the principal actor." *People v. McLean,* 107 A.D.2d 167, 169, 485 N.Y.S.2d 1019 (N.Y.App. Div.), *aff'd,* 65 N.Y.2d 758, 492 N.Y.S.2d 31, 481 N.E.2d 571 (N.Y.1985). The "shared intent" test "merely establishes that acts un-

dertaken in relevant innocence and without a conscious design to advance the principal's crime will not support a conviction for accomplice liability." *People v. Kaplan,* 76 N.Y.2d 140, 145, 556 N.Y.S.2d 976, 556 N.E.2d 415 (1990).

■ A review of the record in the light most favorable to the prosecution reveals that a rational factfinder could have found petitioner guilty beyond a reasonable doubt as an accomplice to the burglary and robbery of Joseph and Grace Bellantone. The evidence did not establish merely that petitioner was at the scene of the crimes, *People v. Parke,* 191 A.D.2d 992, 595 N.Y.S.2d 162 (N.Y.App.Div.), *appeal denied,* 82 N.Y.2d 724, 602 N.Y.S.2d 821, 622 N.E.2d 322 (N.Y. 1993); *People v. Taylor,* 141 A.D.2d 581, 529 N.Y.S.2d 191 (N.Y.App.Div.), *appeal denied,* 72 N.Y.2d 962, 534 N.Y.S.2d 675, 531 N.E.2d 308 (N.Y.1988), but rather established that petitioner idled his car on the street near the Bellantone residence, screeched forward to bring the car in front of the residence, yelled towards the Bellantone residence and entered the car after the burglary and robbery. This Court thus finds that this is not a case in which the evidence shows only that a cab driver picked up strangers unaware that they had committed crimes because the evidence produced at trial provided sufficient evidence for any rational trier of fact to find the essential elements of the crimes with which Moore was charged beyond a reasonable doubt. Accordingly, this Court finds that Moore's claim that the prosecution failed to prove his guilt beyond a reasonable doubt, is meritless and should be denied.

### B. Jury Charge

Petitioner argues that he was deprived of a fair trial by three errors made by the trial court in its charge to the jury. The scope of review on a habeas petitioner's claim that he was deprived of a fair trial by errors in the charge to the jury is very narrow. *Estelle v. McGuire,* 502 U.S. 62, 73, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991). In reviewing a claim that a jury charge was erroneous, the Supreme Court in *Estelle* stated the standard as follows:

The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147 [94 S.Ct. 396, 400, 38 L.Ed.2d 368] (1973); *see also Henderson v. Kibbe,* 431 U.S. 145, 154 [97 S.Ct. 1730, 1737, 52 L.Ed.2d 203] (1977); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 [94 S.Ct. 1868, 1871, 40 L.Ed.2d 431] (1974) (" '[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional] right.' ") It is well established that the instruction "may not be judged in artificial isolation" but must be considered in the context of the instruction as a whole and the trial record. *Cupp v. Naughten, supra,* 414 U.S. at 147 [94 S.Ct. at 400].

502 U.S. at 72, 112 S.Ct. at 482.

Petitioner claims that the judge's response to the jury's note requesting clarification of the charges against him was in error. In response to the jury's request for clarification of the charges against Stanley Moore, the Court responded as follows:

You are asking for someone to come in and clarify the charges against Stanley Moore.

Now, I would point out to you that I read to you this morning, when I was giving you the charge, five separate counts of the indictment, and each count indicated that the defendants, each aiding and abetting and acting in concert with another person, [did] commit certain crimes, specifically, burglary in the first degree, two separate counts of robbery in the first degree and two separate counts of robbery in the second degree, the latter two charges being submitted in the alternative, as previously explained. Now I think to further clarify this for you, it will be appropriate to reinstruct you on the accomplice theory of law.

Now, in so doing, I refer to the fact that you have heard testimony throughout this trial that three individuals were involved in the incident. You are aware that Terry Moore and Stanley Moore are the only persons on trial before you. I instruct you

that you are not to consider or speculate as to why the other person is not on trial.

T. 714. The Court then quoted the statute on accomplice liability and provided further explanation. The Court's response was completely proper.

Although petitioner does not claim that the Court misstated the law, he claims, as his counsel did at trial, that the Court should simply have repeated the charges in the indictment. In response to counsel's objection at trial, the Court stated:

I would refer to the note itself in which they specifically said that they wanted to have the charges clarified against Stanley Moore. Any failure by the Court to give more than a recitation of the charges itself would have been unresponsible and incomplete to the request which was made by the jury. . . .

T. 719. Clearly, the Court was within the broad range of discretion afforded it in responding to the request. *See McShall v. Henderson,* 526 F.Supp. 158, 161 (S.D.N.Y. 1981); *People v. Malloy,* 55 N.Y.2d 296, 302, 449 N.Y.S.2d 168, 434 N.E.2d 237 (N.Y.), *cert. denied,* 459 U.S. 847, 103 S.Ct. 104, 74 L.Ed.2d 93 (1982) (noting that when jury requests clarification of a charge, it may be error to simply repeat the original charge if "the jury, misled by or not comprehending the original charge, remains perplexed about the elements of the crime or the application of the law to the facts."). Review of the transcript shows that petitioner's further complaint, that the defense did not have an opportunity to respond to the jury's note and respond to the Court's proposed instruction, is inaccurate. Although the discussion of the note was conducted in the robing room, the discussion was later described on the record by counsel and the Court. T. 717–719. Petitioner has shown no prejudice from his absence from the robing room discussion.

Petitioner also argues that the Court's statement that "you have heard testimony throughout this trial that three individuals were involved in this incident" was error. The trial judge was not indicating his own belief that all three individuals about whom testimony was offered were in fact guilty. His reference to three individuals was merely

an introduction to his direction that the jury not speculate as to why the third person was not on trial. It was left to the jury to determine whether Stanley Moore was one of the people "involved" in the incident and whether his involvement, if any, satisfied the elements of the crimes charged beyond a reasonable doubt.

■ Finally, petitioner argues that he was deprived of a fair trial by the Court's instruction that the jury findings with regard to whether a knife was used in the burglary and in the robbery should be consistent. The jury was charged that "[a] person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein and when, in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime uses or threatened the immediate use of a dangerous instrument." T. 681–82. The jury also was charged that "[a] person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or in immediate flight therefrom, he or another participant in the crimes uses or threatens the immediate use of a dangerous instrument." T. 686. The challenged portion of the Court's charge is as follows:

> Now I'd like to add still one final instruction with respect to this. You are instructed that you should be consistent in your findings, and hence in your verdicts. For example, in considering the burglary first degree charge, if you decide defendant or another perpetrator used a knife in committing the alleged crime, then you could not find that there was no knife when you are considering the robbery charges. [I]f you made a finding that no knife was used in the crime of burglary first degree, you could not find, when considering the robbery charges, that a knife was used. In other words, you should be consistent in your findings and in your verdict keeping in mind all of the material elements as to each crime as they have been given to you....

T. 700–01.

The Court's charge did not require, as petitioner suggests, that if the jury found Moore guilty of burglary in the first degree it must also find him guilty of robbery in the first degree. Rather, the charge simply directed the jury that if they credited the testimony of the witnesses regarding the knife when considering the burglary charge, they could not then reject the testimony when considering the robbery charge and vice versa. The Court explicitly charged that the jury must reach its verdict "keeping in mind all of the elements as to each crime" charged. Thus, the Court did not err in giving this charge to the jury.

## C. Prosecutorial Misconduct

Federal habeas corpus relief is available on the basis of improper prosecutorial statements at trial only where the prosecutor's errors were so fundamentally unfair as to deny the defendant a fair trial. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). Courts must "consider whether such remarks, in the context of the entire trial, were sufficiently prejudicial to violate [a habeas petitioner's] due process rights." *Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 94 S.Ct. 1868, 1869, 40 L.Ed.2d 431 (1974); *see also Floyd v. Meachum*, 907 F.2d 347 (2d Cir.1990). "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone...." *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). *See United States v. Myerson*, 18 F.3d 153, 162–63 (2d Cir.), *cert. denied*, 513 U.S. 855, 115 S.Ct. 159, 130 L.Ed.2d 97 (1994).

■ Petitioner argues that several comments by the prosecutor, during trial or in summation, prejudiced the defense and deprived him of a fair trial. The first comment occurred during counsel's cross-examination of Linda Ray. The Court indicated that the subject on which counsel was questioning Ray had been exhausted. Counsel responded, "I think the District Attorney has attempted to give the jury the impression that Mr. Moore comes in, gets a vehicle, goes out and leaves. I want it to be clear that he tried to work continuously." T. 460. The prosecutor responded by saying "So what?"

*Id.* Although the trial judge found the remark improper, T. 470, there is no basis for concluding that it significantly prejudiced the defendant or indeed that it had any impact at all on the defense.

Petitioner next argues that the prosecutor, in direct examination of Ray, "suggested if not insinuated 'flight as evidence of guilt.'" Petitioner's Amended Hem. p. 20 ("Pet. Mem."). Ray testified that the car was leased by Moore on May 25, 1982, and was returned on May 31, 1982, by someone other than Moore. T. 433. Later, defense counsel unsuccessfully moved for a mistrial, claiming that the prosecutor had improperly implied that there was evidence of flight. T. 468–72.

■ There was no impropriety in eliciting Ray's testimony about the return of the car. Moore testified and provided an explanation for the return of the car. T. 579–80. Since the prosecutor, in summation, made no argument that the return of the car was evidence of flight, there is no occasion to consider whether the record would have supported such an argument.

■ Moore also argues that the following comments on summation were improper. The prosecutor stated: "What better way to effect a getaway than in a gypsy cab than, in an innocuous gypsy cab." T. 653. Referring to the testimony of Gonzalez, he stated, "Three seconds, [Gonzalez] said, after he moved his dog that car screeched to here. If [Moore] was just picking up a fare, how did he know to move at that time? How did he know two men were going to come out of that Bellantone [sic] house? Was he a Houdini? Is he a mindreader?" T. 655. Referring to the testimony of Stanley Moore, he asked: "Did he ever say anything unusual happened to the car on May 25th? Did he tell you anything happened to the car? No, he didn't say anything unusual." T. 657. In light of the evidence presented at trial, these statements were not improper, but rather were fair comments on the evidence and fair responses to petitioner's defense.

### D. Sentence

■ Petitioner argues that he was denied due process at his sentencing because he was punished on the basis of misinformation in the pre-sentence report and because he chose to go to trial rather than plead guilty. At petitioner's sentencing, the Court, after noting petitioner's substantial prior record, stated:

> And there's one more very significant element, in this Court's judgment, in this entire equation. As you read from the report of the rape and robbery on which he was convicted, he had another perpetrator, a cousin who was with him.
>
> It was clear from the evidence as reported in the pre-sentence report—but this was the individual who was the dominant individual, the leader in the crimes that were committed.
>
> Now, in addition to that, this Court has witnesses [sic], as you know, Mr. Wiggins [petitioner's counsel], the attempt by his brother to plead guilty before this trial when under way. And only through the dominance of this individual over his brother was his brother prevented from entering the plea....
>
> This man's dominance over his brother, the extent of his record make it an unequal situation, and hence he is going to be treated as fully culpable for everything that did transpire within that house....

Sentencing T. 22–24. Petitioner argues that his prior conviction did not involve a "cousin" and that there was therefore an error in the pre-sentence report. "The burden of proof is on [petitioner] to show that the information relied on by the sentencing judge was in part erroneous." *McCrae v. Blackburn,* 793 F.2d 684, 687 (5th Cir.), *cert. denied,* 479 U.S. 965, 107 S.Ct. 466, 93 L.Ed.2d 411 (1986). In addition, the erroneous information relied upon must be material before it will provide a basis for relief. *See King v. Hoke,* 825 F.2d 720, 724 (2d Cir.1987). If an error is established, "the burden shifts to the State to show beyond a reasonable doubt that the error was harmless, that is, that it had no effect upon the sentence received by petitioner." *McCrae,* 793 F.2d at 687 (*quoting Thomas v. Savage,* 513 F.2d 536, 539 (5th Cir.1975), *cert. denied,* 424 U.S. 924, 96 S.Ct. 1135, 47 L.Ed.2d 333 (1976)). Petitioner has not established that the information was in

error. Following the court's comments at the sentencing, despite opportunity to do so, neither petitioner nor his counsel stated that any error had been made. *Cf. United States v. McDavid,* 41 F.3d 841, 844 (2d Cir.1994) (lack of opportunity to reply on a material misapprehension of fact is a factor to consider in determining whether there has been a denial of due process at sentencing).

■ Even assuming that the Court mistakenly believed petitioner committed the prior crime with a cousin, this information clearly was not material, and the Court's mention of it was harmless. The Court attached no special weight to the fact that a cousin was involved, but instead, emphasized that petitioner had previously been convicted of the crimes of rape and robbery and that he played an important role in those crimes.

■ Petitioner also argues that "implicated [sic] in the Court's statement for enhancing punishment is the unconstitutional reference that the petitioner was severely punished for asserting his right to a jury trial." Pet. Mem. at 33. In *Wasman v. United States,* 468 U.S. 559, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984), the Supreme Court noted that "due process does not in any sense forbid enhanced sentences or charges, but only enhancement motivated by *actual vindictiveness* toward the defendant for having exercises guaranteed rights." *Id.* at 568, 104 S.Ct. at 3223. It is clear that petitioner's sentence was in no way related to the exercise of his right to go to trial. The Court's comments concerning petitioner's "dominance" over his brother in convincing him not to plead guilty did not convey vindictiveness by the judge that petitioner and his brother stood trial. Rather, the Court's comments were directed at whether petitioner's sentence for the crimes of burglary and robbery should be less than the maximum because he did not directly participate in the crime or whether, given Moore's relationship with and apparent dominance over his brother, he should be held fully accountable for the crimes. Sentencing T. 21–22.

## E. Ineffective Assistance of Trial and Appellate Counsel

The final two claims contained in Moore's habeas corpus petition concern the performance of his counsel at both trial and on appeal. Moore asserts that he was denied effective assistance of trial counsel because counsel acted unprofessionally, was ignorant of the criminal law in that he failed to request a circumstantial evidence charge, and failed to challenge misinformation contained in Moore's presentence report. Moore also claims that he was denied effective assistance of appellate counsel because counsel disparaged his claim of complete innocence.

In order to successfully raise the claim of ineffectiveness of counsel, petitioner must meet the two pronged test of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Under *Strickland,* petitioner must show both that "counsel's representation fell below an objective standard of reasonableness," *id.* at 668, 104 S.Ct. at 2064, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694, 104 S.Ct. at 2068. If either prong is not satisfied, the other need not be addressed. *Id.* at 700, 104 S.Ct. at 2071. As the Supreme Court has noted, "[t]he essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986).

■ Petitioner's claim that his trial counsel acted unprofessionally is without merit. In support of this claim, petitioner cites to pages of the transcript in which counsel was admonished by the court. Having reviewed these pages, this Court finds that petitioner's alleged instances of unprofessionalism are of no constitutional significance. As the Second Circuit has stated, "[t]hat counsel was criticized at times by the court certainly does not show that representation was defective; ... criticism of counsel was often the result of attempts to go beyond the 'rules of the game'—overzealousness does not amount to ineffective assistance of counsel under *Strick-*

*land." United States v. DiPaolo,* 804 F.2d 225, 234 (2d Cir.1986). This Court finds that counsel's admonition by the trial court in the instant case similarly provides no basis for habeas corpus relief.

Petitioner also claims that he was deprived of effective assistance of counsel because counsel was allegedly ignorant of the criminal law in that he failed to request a circumstantial evidence charge. New York law provides:

> Whenever a case relies wholly on circumstantial evidence to establish all elements of the charge, the jury should be instructed, in substance, that the evidence must establish guilt to a moral certainty. However, where a charge is supported with both circumstantial and direct evidence, the court need not so charge the jury.

*People v. Daddona,* 81 N.Y.2d 990, 992, 599 N.Y.S.2d 530, 615 N.E.2d 1014 (1993) (citations omitted).

■ Counsel in the instant case was not ineffective in failing to request a circumstantial evidence charge because there was both direct and circumstantial evidence of the crimes with which Moore was charged. Two eyewitnesses identified Moore, and one eyewitness testified that, while two men were inside the Bellantone residence, Moore yelled to them "come on" and "let's go." Under these circumstances, this Court finds that petitioner was not entitled to a circumstantial evidence charge under New York law, and that therefore, petitioner's trial counsel made no error in failing to request one.

Petitioner also argues that his trial counsel was ineffective at sentencing. First, Moore asserts that counsel failed to challenge misinformation in Moore's presentence report. Petitioner's only claim of error is that the court mistakenly believed that the crimes with which Moore was charged were committed with Moore's cousin, when that was not the case. As stated above, petitioner must show both that counsel erred, and that petitioner was prejudiced by such error. *Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071. Because petitioner has shown no prejudice resulting from this alleged error, his claim regarding the presentence report must fail.

Second, petitioner claims that his counsel testified as a witness against him at the sentencing in that counsel stood mute and voices no objection when the Court, during sentencing, suggested that counsel was aware that petitioner had spoken to petitioner's about withdrawing his plea. This Court finds that this claim is meritless. The sole basis for this claim appears to be the trial court's comment that "this Court, has witnesses [sic], as you know Mr. Wiggens, the attempt by his brother to plead guilty before the trial went under way." (Sentencing T. 23 (emphasis added).) The trial Court's rhetorical "as you know Mr. Wiggins," in discussing the court's basis for Moore's sentence, did not turn Mr. Wiggins into a witness. Correspondingly, Mr. Wiggins' lack of response to the trial court's comment did not constitute testimony. Moreover, the fact that petitioner's brother initially had proffered a guilty plea is clearly reflected from the record. As a result, this Court finds that petitioner's claim that his counsel testified as a witness against petitioner is inaccurate, meritless, and should be dismissed.

■ Finally, petitioner's claim that his appellate counsel was ineffective because she disparaged petitioner's claim of innocence is frivolous. Petitioner argues that his appellate counsel advanced arguments that petitioner was guilty of criminal acts. This Court's review of appellate counsel's brief, however, reveals that this document is devoid of any such arguments. Moreover, on appeal, Moore's counsel argued that the evidence presented against Moore at trial was insufficient to support Moore's conviction. Petitioner further objects to appellate counsel's argument that Moore's convictions should be reduced to second-degree burglary and third-degree robbery because, even if the evidence was sufficient to support a finding that Moore was a participant in the crimes charged, it was insufficient to support a finding that he was aware that force would be used or that the two people who entered the apartment had weapons. This Court finds nothing objectionable about appellate counsel's argument. This argument in no way suggests that counsel believed that Moore was a participant in the charged

crimes, but rather represents counsel's attempt to raise every alternative argument on her client's behalf. Thus, this Court finds that petitioner's ineffective assistance of appellate counsel claims are meritless and should be dismissed.

## CONCLUSION

IT IS HEREBY ORDERED THAT the habeas corpus petition of Stanley Moore is DENIED.

SO ORDERED.